Good morning, counsel. Good morning, Kent Young Federal Defenders. On behalf of Mr. Sanchez, there's obviously a number of issues here, so I'll begin by addressing the denial of the requested adverse inference instruction. On the date of Mr. Sanchez's arrest, his vehicle was driven to the secondary inspection area and searched for narcotics by agents. During the course of the search, they removed much of the foam cushioning from inside the seats when they retrieved the cocaine. They failed to preserve that foam cushioning. Prior to trial, Mr. Sanchez moved for an adverse inference instruction due to the destruction of evidence, which the district court summarily denied in a minute order without performing any reasoning or analysis. An adverse inference instruction was warranted in this case, in particular, for two reasons. First... Did we even talk about foam to the district court? It was done primarily in the context of Russ Butler's testimony, that request for an adverse inference instruction, but... Well, that was some worry to me because it seems to me your argument now changes to foam, but what I saw in front of the district court didn't even emphasize the foam worry. What we had was we have a chair. We have that chair taken apart because there was evidence in there of the drugs, and so they got the drugs out there, and then they had the chair, and it still was in the same position it was. There wasn't any foam. They took the foam out when they got the drugs, and the district court wasn't even told about the foam, and so now I want an adverse instruction. Well, I believe the request for an adverse... I mean, what's my standard of review on that? Well, the request for an adverse... I mean, my worry is that the district court's got the first verse. I'm looking over his shoulder and saying, that's totally implausible, Judge, when you don't even talk about foam to him. Well, I think there's two responses to that. First, we know from the Hinkson two-part abuse of discretion test that the district court abuses its discretion when it fails to perform the correct or identify the correct legal rule. Here there's no reasoning or analysis at all by the district court. All you're really saying is your biggest deal here is then that the district court has to explain its reasoning. Is that what we're really about here? If he had explained his reasoning, then there wouldn't be a problem? Well, he didn't conduct the required balancing test under Sevilla. I mean, I looked at Orellano, and this is, again, Idaho talk, O-R-E-L-L-A-N-A, Blanca, and where we had a similar situation here. We were worried about whether the district court was right, and what we did is we took it and we said, well, I don't know whether there's a sufficient foundation here for the district court to make this, but we can make it, and there's facts that will give us what we need. Yes, the court could, for the first time, determine whether or not it's the same business. My worry is that we've got an abuse of discretion standard. We haven't presented the same things to the district court that we're now presenting to me, and I'm supposed to on an abuse of discretion standard, overlook what happened and say, that was bad. You should have given an instruction. Well, the motion in Lemonnier papers did note that the seat was not in the same condition as it was at the time that Russ Butler inspected it, and that an adverse inference instruction was warranted because it was altered during the course of the search, and it wasn't in the same condition. So whether I don't have it, the motion in Lemonnier paper. If you look at exhibits D and M, I think, the front part of the seat, the photos of the front part of the seat, there was no real change. There's no real difference. There's a slip there, and nothing was argued to the district court or even argued here that any foam was left out of there. That's where if he backed up against it, you know, it would have been hard. I don't understand how the judge would know that because some foam out of the back was left out, obviously, if foam was never mentioned, he doesn't know anything. Just saying that the seat's not in the same condition doesn't tell him anything. Well, during the course of the trial, it was discussed that there was foam removed, and Russ Butler noted during his testimony that there was foam strewn around the vehicle, and he talked about on cross-examination. This is all later. That is true. It is later, yes. He talked about on cross-examination about how he was trying to reconstruct which foam came from which seat and whether it was the original foam or the altered foam. Let's take your point. Let's assume for a moment that this was error. Don't we look at this on the basis of whether there was basically a harmless error analysis? Isn't that what we're left with here in this? Well, SEVIA actually lays out a number of factors to look to prejudice, and those factors— Answer my question first, though. It's really harmless error, right, that we're looking at? Yes. You're going to tell me about how we are supposed to determine whether there was harmless error, right? Yes, that's correct. That is the standard, though, right? That's correct. Okay. And so to determine prejudice, the court looks to the centrality of the evidence of the case and its importance in establishing the elements of the crime or the motive or intent of the defendant, the probative value and reliability of the secondary or substitute evidence, the nature and probable weight of factual inferences or other demonstrations and kinds of proof allegedly lost to the accused, the probable effect on the jury from absence of the evidence, including dangers of unfounded speculation and bias that might result to the defendant if adequate presentation of the case requires explanation about the missing evidence. And so as to the first factor, the centrality of the evidence to the case, and the seat was pretty important to the case, and it was really important for two big reasons. First, it came up significantly in Russ Butler's testimony. There's a moment in a lot of criminal trials where a crime victim takes the stand and is asked by the prosecutor, do you see the person in court who committed the crime? And the witness picks out an item of clothing and the prosecutor says, will the record please show that the witness has positively identified the defendant. And that's kind of what happened with Russ Butler's testimony here. He's taking the stand, he gives his opinion about the seat and that it would have felt hard or lumpy to anybody who was at least 5 feet tall and 110 pounds. And then the court asked Mr. Sanchez to rise and Mr. Butler is asked, does Mr. Sanchez appear to be at least 5 feet tall and 110 pounds? And Mr. Butler says yes. And it's almost like an eyewitness identification. It was very important to the government's case. And it was also central because of what the government told the jury to do during its closing argument. During its closing argument, the government told the jury to experiment with the seat during its deliberations. And the government counsel said, ladies and gentlemen, he knew. First, the cocaine was in the back of that seat right there. That seat will be available for you during your deliberations. I invite you to feel how much padding was left. I'd invite you to have one of your members sit down in the seat and have the other jury members watch from the back what happens to the springs. And then again, in its rebuttal, the government tells the jury, they question Mr. Butler's examination of the vehicle. If you question Mr. Butler's examination of the vehicle, if you question Mr. Butler's examination of the seat, anybody can examine the seat. Do the test that Agent Middleton did. Sit in the seat. Feel the seat. Look at what happens to the back of the seat. Ask to come out and view the cocaine and ask to feel the cocaine. Feel the cushions in the seat. Feel the cocaine. See if the cocaine has the same softness, for lack of a better word, as the seat's. All the evidence is available to you. Ask to see it. But all the evidence wasn't available to them because, of course, much of the foam cushioning was removed from the seat during the course of the search and not preserved. And so it went centrally to those two points, the introduction of the physical driver's seat and Russ Butler's testimony. Is this, for our purposes, is this your best case? Is this what you want us to focus on, is the issue of the instruction or the want of instruction and the foam? Well, there's a number of other issues I also want to talk about, too. I mean, he stole my question. He stole my question. Oh, sorry. Such a good, I mean, they think we're cousins.  We're really not. But he stole my question. Is this the one really, is this the linchpin of your case? I think it is one of the main issues. There's another couple I'd also like to talk about, too. All right, hit one of them. Okay. Russ Butler's testimony, which is obviously a freestanding issue, and there's two parts to this, that the district court failed to perform its gatekeeping function, and then even if this court conducts the Rule 702 analysis for the first time on appeal, that his opinion wasn't the product of reliable principles and methods. And as far as the first part to that, the failure to perform the gatekeeping function, the request to exclude Butler was denied in a minute order. Who argued this issue to the district court? We filed a motion in Lemonnier to exclude. You filed a motion, but did we ever have an argument? There was no discussion at the in Lemonnier hearing about this, the particular argument in the motion, but it was filed, it was presented to the district court, the district court issued a minute order denying it. I mean, so all we've got really, it seemed to me, was a motion by you and a decision by the district court in the minute entry. That's correct. Well, I guess I'm having a tough time when there was no argument about it. Are you saying the district court's minute entry wasn't enough on a motion in Lemonnier? I'm trying to get to the case you're going to cite. Barabang? I don't think Barabang really does it. I think, well, I know it's your case, so I kind of wanted to talk about it. I mean, that's why. Both of you, yeah. It was our case, and I don't think it really gets there. Okay. I mean, my worry is there's a motion in Lemonnier. I sat on the trial court. We've got another trial judge sitting right over there. He sees it every day. We get a motion in Lemonnier. Nobody ever talks to us about it. So you go through in the minute entry, and you make your decision. It's real hard for us to say, oh, boy, you should have done more on this particular matter. When all there is is a motion in Lemonnier, and you go find a case to try to back that up. Barabang isn't it. So I'm trying to say, what case is there? I mean, if there had been more said, I can see that the good old judge should have said something, gone through the analysis, and put it on there. But with all that happened, I'm having a tough time understanding why he didn't go through the analysis. He just didn't put it on in the minute entry. And if I go through the minute entry or the analysis now, I can assume a lot of stuff, which you won't like. But that's the thing that worries me. I think part of the reason why it was necessary, and I think you've identified the problem, Judge Smith, why it was necessary for the district court to actually go through the analysis is for the appellate records. So we could know what the district court's reasoning was in denying the motion, because we're left with a minute entry, and so this court is left to speculate. Did he find, what was the basis for concluding that Russ Butler's testimony was the product of? I can go through here and look at the qualifications of the expert. I can go through and see what was in the record about that. And I can say there's ample to get it in, but I'm not the gatekeeper, and that's the problem. I can make all those things. And, again, you've got a different issue here than we really had in our other case. It's obviously with Barabane, it was a little bit more nuanced where there was an about face with the district court of letting the plaintiff's expert in without much explanation. Yeah, that's exactly right. But, you know, there was similarly no explanation here. It wasn't like where you're going to say no, you can't come in, or yes, you can, and then you change your mind. Then it seems to me you've got to put something on the record. Right here we've got a motion eliminating that's it, and he, the district court, made a decision about it. I see I'm running low on time. Okay, maybe you go to the next one. Do you want to save some rebuttal time? Oh, maybe you want to save. I would like to just talk briefly about prosecutorial misconduct. As long as you don't go over a minute and 50 seconds. Okay, well, I'll reserve the remainder of my time. Okay. Okay, thank you. We'll hear from the governor. Good morning. Kyle Hoffman for the United States. The issue of the foam and the seat, I would agree with Judge Smith that that issue wasn't presented to the district court in the first instance. There was a motion to exclude the seat, and then just in general, because it was in a different condition, and then on appeal the issue was adverse inference instruction and its unduly prejudicial under 403. Those were the issues that were framed. And it was the seat in general. It was not really until the reply brief that we get talking about foam. I'd also agree, we've got a lot of different evidence in different forms. There's the seat, the actual physical seat, which I actually wish I had gotten. I'm not sure it still exists, but it would be an interesting exercise to put it here in front of the court. I'm sorry I didn't. I'm glad you didn't. I am, too. I would have been in a lot of trouble for not good reason. I mean, to me... He's allergic to foam, too. To me, I only put in an adverse jury instruction if there's destruction of evidence. I'm having a tough time seeing where there was a destruction of evidence. The condition of the seat was altered. That was it. And there was no, absolutely no evidence the government did more than take the foam out of it at best. And then the foam cushioning is not here. District Court didn't have that. I'm having a tough time. I'm in heated agreement with Your Honor. I expect you would. And in any event, one of the kind of overarching themes I have, I think, for the court and for my brief is, and what Judge Burns would say repeatedly, is when we have evidence, we leave it to juries to make decisions about the evidence. Since the jury knew that the seat wasn't in exactly the same condition as what it was, everybody was on board with that. People argued it. They looked at the evidence. That's why we have juries. They make inferences from that evidence. So, on the foam. Since we cut him off before he really got there, I want to ask you a little bit about what the prosecutor said to the jury. Why didn't the prosecutor volunteer evidence outside the record in terms of what gangs do? It seems to me he did. I would suggest no, Your Honor. Why? What evidence do I have of what gangs do except what the prosecutor told the jury? Well, the first thing I would do is disagree with Your Honor a little bit about it being gang. I don't think the word gang was ever used. There was some talk about if you're involved in drug trafficking. All right, drug dealers do. What evidence is there outside the record of what drug dealers do?  And why I would suggest that what he did was proper, I would hinge my argument really. The main thing is he testified. He was cross-examined extensively about the meaning of this coded language. He said it meant what it seemed to me on the surface. But once he got on the stand, once he denied that, the jury is entitled to infer, and I've cited cases for this proposition, the exact opposite. And so, in essence, the prosecutor, as cross-examination often does, is making his closing argument through cross-examination. The defendant denies it. He gets up on redirect and says, no, it means what I actually said it meant. But then it's, I mean, this is kind of a colloquial expression, it's Katie bar the door as far as that evidence is concerned. The jury can infer he's lying. It means coded language, as the prosecutor was asking him. So all of that is in evidence. If it's coded language, why wasn't there an expert? Because it seems to me that what we're really doing is we're saying, well, if it's coded language, the jury either has what the defendant tells them or what the prosecutor tells them, because there's no other evidence. Well, there's the evidence of what's actually said on the calls themselves, which I've argued don't make sense on their own terms. When the wife says, I just got $1,500 for the thing about the dogs, and the explanation is, oh, that's because we sold some dogs for her son. Well, she would say, Mario sold the dogs. Well, that connects up with he got popped, so to speak, by the dogs. So there's other evidence that the thing doesn't make sense on its own, and then there's other evidence of facts in the record that make that code, so to speak, intelligible. And I should also point out that Judge Burns, at the Rule 29 motion, even before the defendant got on the stand, said those jail calls were coded language. So I'm suggesting that there's evidence on all kinds of levels that enabled the prosecutor to argue that. There's the evidence of the calls themselves, how they hook up with the other evidence in the case, and most crucially, the defendant getting on the stand, testifying, denying that they meant that. Then it's up to the jury to decide. So I suggest that all of that is evidence in the record and is proper for the prosecutor to argue on. But what evidence is there? What is there in this record which would say what the prosecutor was telling the jury was true, except the prosecutor telling the jury? It seems at that point the prosecutor gets on the witness stand and says, this is what you're hearing. This is the way it goes. I'm knowledgeable about all this, and I'm telling you, this is what you're hearing. Well, Your Honor, I'm glad you asked the question that way, because that's exactly what the prosecutor didn't say. That would be a problem. I've done a bunch of these cases, and I can tell you that this is what it means. But the prosecutor emphatically did not say that. But just the fact that he got up and was arguing it, I mean, without anything in the record to suggest it. See, that's where I disagree. I understand. You're just saying because the defendant gave testimony, that was enough. And it's not just that. It's the constellation of reasons, the making sense on their own terms, connecting up with other facts and evidence, the defendant testifying and denying it. The references in the calls themselves to, we are being recorded, everybody knows this. And the prosecutor argued, they know they're being recorded. They're not going to say things the way that they mean on the surface. They're going to disguise it. That's argument from evidence in the record. Then Chewy says, I'm going to tell you this in a disguised way. Whoa, okay, here we go. There's code in here. So I'm suggesting that there's a whole constellation of facts in the record that will enable the prosecutor to argue. And to distinguish it from the cases that Your Honor is talking about, never was it said, hey, I'm an experienced drug guy and let me just tell you this is what they do. So you're, in effect, you're following Tucker. You're saying that because, number one, you had the language, the coded language or whatever it was, and you had the defendant saying what it wasn't. Right. That the prosecutor in the closing argument is entitled to draw reasonable inferences from that evidence. Because that language, code we'll call it, was clearly evidence. The testimony of the defendant was clearly evidence. Right. And he was entitled to draw reasonable inferences from that. Correct. And my overarching theme on that is if it would be a reasonable inference for a jury to draw, it has to be a reasonable inference for the prosecutor to argue. How could it be otherwise? And those were reasonable inferences for a jury to draw, given all the constellation of facts in the record for the court. Well, the reason I ask the questions is that this seems to be the most, if you will, outlandish situation where a prosecutor takes evidence in the particular situation and tells the jury what it means when no one else has told them. Can I – I didn't, I think, correctly answer Your Honor's question about the expert, and I think this question brings it up again. I think if you think about it, if the United States had offered an expert, there would have been objections like crazy. What's an expert going to testify to? These are kind of one-off conversations. I'm not going to say they're the most sophisticated kind of code. They're not, really. So they're not code. Is that what you're saying? No, I'm saying they're disguised, but they're not disguised in a way, oh, I've been involved in gangs, and this is how gangs talk, with schnizzle and all kinds of other things. They're not that kind of language. So an expert really wouldn't be equipped to do this. Nor would you have – it's two jail calls that we're talking about. Nor would you have an investigator who's been on – two days, three calls. Would you have an agent who said, I've been on this case for 10,000 hours, and I've gotten used to how these people talk. So I don't think an expert or a lay opinion testimony would even be – I'm having a hard time seeing how it would even be admissible. And I know that the defense would argue it's not admissible, very clearly. It's kind of a one-off conversation, thinly disguised, but disguised. And then I'd also – the reason I relied – I found this Johnson case from the Seventh Circuit and why I cited it is because I looked back at the record in that case. And it was just the jail call and the prosecutor's argument. And the court, both the district court and the appellate court, said, look, I don't necessarily even agree with this inference that these jail calls meant what the prosecutor argued they meant. But it's a reasonable one. That's a jury call. It's a reasonable one based on this evidence. That's a jury call. And that's the theme of it. So if I think this is error, what is my analysis? If you think it's error? Yes. I will concede I didn't argue harmlessness. Can I get there? Yes, you can. Why? Well, I think my opponents already acknowledged that in the reply brief. There are cases that say you can find harmlessness despite the government not raising it in its brief. And I'll say this. I didn't argue it for a lot of reasons. One was I thought there was no error, period. Maybe I had drunk my own Kool-Aid in that respect, but I really thought that. Second, the brief was already long. And to really parse out every single statement and say this is harmless error, the court is very patient, I'm sure, but it would have tried the court's patience even more. But having said that, if the court says one of the translations of the code, so to speak, is error, the court could find that there's other evidence that the verdict wasn't materially affected. That's just law. What case would you cite us to for the proposition that you advanced a few moments ago that the prosecutor is entitled to make and state the same statements based on inferences that a juror would be entitled to make? Well, it's kind of putting together the standard rules of a jury is or a prosecutor is allowed to argue reasonable inferences from the record. Right, that's the Tucker concept. Right. So verdicts get thrown out if no reasonable jury could find, meaning that no reasonable fact finder could make that inference. I'm putting those two rules together for that proposition. It's almost a matter of logic, in a way. You're saying this is the tautology rule. In essence, yes. And Johnson, I think, the Seventh Circuit case, exemplifies that in action, so to speak. It's not a prosecutorial misconduct case. Clearly, it's not. But the argument was, this is just made up. The prosecutor is just making this up. But the appellate court and district court said, no, it's based on evidence in the record. It's a reasonable inference. Therefore, it's okay. So unless the court has further questions. Other questions from my colleagues? No. I think not. Thank you, counsel. So we'll hear rebuttal from defense counsel. On prosecutorial misconduct. First, the government talked about this being a credibility issue, because Mr. Sanchez testified. But that wasn't how the argument was phrased in closing. It wasn't phrased to the jury as, you are the trier of fact. You're entitled to weigh the credibility of the defendant and all witnesses. It was the government counsel making statements about what these terms meant. Didn't he say, though, things like the government submits or I submit? There is one point where he says that. But there's another point where he says he got $1,500 extra because he got caught by the docs. And there's no I submit. There's no indication there. Under your analysis, would he have to use the term submit each time he said something to avoid vouching? Or once he frames his argument in terms of the government submits or we submit, that's a sufficient predicate to qualify the nature of his statement? I think he would definitely need to say it each time. I want to talk briefly about harmlessness because, first, as we've noted, the government hasn't argued it. But even if this court does do it sous sponte, 73% of the closing argument by the government was on these jail calls. It was a big, big part of the case. Mr. Sanchez had a plausible defense, and this went straight to undermine it by the government. And finally, one final point. What's really troubling, I think, about the prosecutorial misconduct issue is that there are hundreds of, or essentially hundreds of hours of jail calls. And for the government counsel to pick out a couple of snippets without putting on an expert to testify or a case agent as to what these terms meant, it really does go to facts, not in evidence, and does put the weight and prestige of the United States government behind what the prosecutor is saying. Any questions from my colleagues? Thanks to both counsel for your argument. The case just argued is submitted, and the court stands in recess for the day.
judges: Lamberth, Smith, Smith